**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

UNITED STATES OF AMERICA

vs.                                                    CASE NO. 3:10-cr-199-J-32MCR

DENNIS GRAY WILLIAMS

_____

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

On September 15, 2010, Defendant was charged in a seven-count superseding indictment. (Doc. 19.) With the consent of the government and the Court, Defendant waived his right to a jury trial. (Doc. 75.) Accordingly, Defendant was tried before the Court sitting without a jury on April 18 and 19, 2011, the record of which is incorporated herein by reference. (Docs. 74, 76.)

At the close of the government's evidence, Defendant moved pursuant to Fed. R. Crim. P. 29 for a judgment of acquittal on all counts. (Doc. 81 at 116.) The Court heard argument and ultimately directed the parties to brief the issues and to submit proposed findings of fact and conclusions of law, which they have now done. (Docs. 86, 91, 92.) After due consideration, the Court will deny Defendant's Rule 29 Motion and adjudicate Defendant guilty as to all counts.[1]

_____

[1] The Court's April 25, 2011 Order setting the briefing schedule for the parties' proposed findings of fact and conclusions of law provided that "[a]fter review of the parties' filings, the Court will either schedule oral argument or allow the government to file a brief reply." (Doc. 79 at 2.) Given the extensive argument on the issues during trial (see Doc. 81 at 116-55) and the parties' thorough briefs, the Court has determined that neither a reply brief nor oral argument are necessary.

## I.    CHARGED OFFENSES AND PROCEDURAL POSTURE

Each of Counts One through Five of the superseding indictment charge Defendant, in summary, with fraudulently passing a counterfeit check that appeared to be issued by a financial institution, each time in violation of 18 U.S.C. § 514.  Count Six charges Defendant with fraudulently obtaining money and property on multiple occasions by unauthorized use of an access device, that is, a bank account number belonging to another person, to pay for goods and services, in violation of 18 U.S.C. § 1029(a)(5) and (c)(1)(B).  Count Seven charges Defendant with failure to appear for a final hearing on revocation of supervised release imposed in previous cases before this Court (specifically, Case Nos. 3:03-cr-33(S1)-J-32TEM and 3:04-cr-48-J-32TEM), in violation of 18 U.S.C. § 3146(a)(1) and (b)(1)(A)(ii).

In consenting to a non-jury trial, Defendant requested that the undersigned make specific findings of fact regarding the charged offenses.  (Doc. 75); Fed.R.Crim.P. 23(c). Defendant's Rule 29 Motion, however, presents pure legal issues which assume that Defendant committed the charged acts.[2]  Despite this analytical dichotomy, both the sufficiency of the government's evidence and Defendant's legal arguments for judgment of

---

[2]    Almost without exception, Defendant's Rule 29 Motion does not meaningfully contest the facts presented by the government at trial, nor that those facts are sufficient to prove beyond a reasonable doubt that he was the person who engaged in the fraudulent conduct described in the various witnesses' testimony.  Rather, the Defendant's Rule 29 Motion argues that he should be acquitted as a matter of law because the statutes governing each of the charged offenses do not apply to the conduct proved by the government.  Count Seven is the lone outlier in this regard, as Defendant does contest whether the government proved an element of that offense—that he "knowingly" failed to appear—beyond a reasonable doubt.

acquittal are addressed concurrently in the sections below.  As an initial matter, the Court

considers the elements of each of the charged offenses.

## II.    RELEVANT FACTS AND LEGAL ANALYSIS

### A.    Counts One Through Five - Passing Counterfeit Checks

Counts One through Five of the superseding indictment charge Defendant with

passing counterfeit checks in violation of 18 U.S.C. § 514.  The Eleventh Circuit pattern jury

instructions do not include an instruction for violation of § 514.  However, the parties agree

that, based upon the language of the statute and Offense Instruction No. 18.3 (which

governs the offense of passing counterfeit forged securities in violation of 18 U.S.C. §

513(a)), the following elements must be proved by the government beyond a reasonable

doubt to convict a defendant of violating § 514:

> (1) the defendant knowingly passed, uttered, or presented, attempted to pass,
> utter, or present, or caused to be passed, uttered, or presented, or knowingly
> possessed within the United States, a false or fictitious document;
>
> (2) the false or fictitious document appeared, represented, or purported to be
> an actual security or other financial instrument issued under the authority of an
> organization whose activities affect interstate commerce; and
>
> (3) the defendant acted with the intent to defraud.

In support of its charges in Counts One through Five, the government introduced

evidence at trial establishing that the Defendant passed counterfeit checks, with the intent

to defraud, on at least five separate occasions.[3]  Four of the five checks passed by

---

[3]      As further evidence of Defendant's intent to defraud, the government also
introduced numerous items related to the production of counterfeit checks that were in
Defendant's possession on the day he was arrested, including counterfeit SunTrust Bank
checks purportedly from an account held by the Georgia Department of Juvenile Justice

Defendant utilized the bank account number of Laurie and Mark Gelman and the routing number for the bank that held the Gelmans' account, CNL Bank. (Doc. 80 at 192, 196, 202, 208-09; Ex. 4, 6, 12, 13.)[4] The fifth check, which listed "Jim and Kathleen Smith" as the account holders, utilized the account number of an entity known as the "Florida Healthy Kids Corporation" and the routing number for the bank that held the account, SunTrust. (Doc. 81 at 58-59; Ex. 10.)[5]

---

(Doc. 80 at 139-40; Doc. 81 at 54; Ex. 35); two computer disks containing VersaCheck check creation software (Doc. 80 at 156-67; Ex. 54); and five boxes of blank check stock (Doc. 80 at 156-57; Exs. 55-59). At trial, Defendant's counsel made an ore tenus motion to suppress the latter two pieces of evidence, which were recovered from an apartment in Knoxville, Tennessee that Defendant was inhabiting, on the grounds that the investigators lacked proper consent to search the apartment. (Doc. 80 at 167.) The Court denied the motion as both untimely and unmeritorious. (Id. at 170-73.) Defendant renewed the motion at the close of evidence, (Doc. 81 at 157-58), and for the reasons previously stated by the Court on the record at trial, the renewed motion is DENIED.

[4] Defendants' passing of falsified checks utilizing the Gelmans' account information is charged in Counts One, Two, Four and Five of the superseding indictment. The government introduced testimony from witnesses establishing that Defendant was the person who passed the four checks, each of which was ultimately negotiated by other parties. (Doc. 80 at 20-27, 36-46, 56-57, 93-100.) Three of the four checks (Counts One, Two, and Five) had been falsified to list the account holders as persons or entities other than the Gelmans. (Ex. 4, 6, 13.) The government's evidence also demonstrated that the one check listing the Gelmans as the account holders (Count Four) was clearly fake, (compare Ex. 12 with Ex. 2 at (unnumbered 28)(demonstrating the difference between genuine check number 4825 and its phony counterpart)), and Mr. Gelman confirmed that the signature on this check, purportedly Laurie Gelman's, was forged, (Doc. 80 at 203.) Through the testimony of CNL's director of deposit operations, Suzanne Rodman, the government established that CNL is a federally-insured lending institution. (Doc. 80 at 222.)

[5] Defendant's passing of a falsified SunTrust cashier's check utilizing the account information of the "Florida Healthy Kids Corporation" is charged in Count Three of the superseding indictment. The government introduced testimony establishing that Defendant was the person who passed the check, (Doc. 80 at 105-114), and that the check was counterfeit, (Doc. 81 at 58-59.) Through the testimony of SunTrust's regional security coordinator, David Whitehurst, the government established that CNL is a federally-insured

Defendant does not contest that any of the five checks were false, forged, or counterfeit.[6]  Likewise, Defendant does not argue the checks did not appear to be checks issued by banks, that the banks did not operate in interstate commerce, or that he did not act with the intent to defraud.  Rather, as stated in his proposed Findings of Fact and Conclusions of Law, "[t]he defendant's sole argument in support of his Rule 29 motion as to counts one through five is that his alleged fraudulent conduct did not violate section 514 as a matter of law because the counterfeit checks in question were not 'false or fictitious documents'" within the meaning of that statute.  (Doc. 91 at 3.)

Section 514, which is entitled "Fictitious Obligations," provides that:

(a) Whoever, with the intent to defraud--
. . .
(2) passes, utters, presents, offers, brokers, issues, sells, or attempts or causes the same, or with like intent possesses, within the United States
. . .
*any false or fictitious instrument*, document, or other item *appearing, representing, purporting, or contriving through scheme or artifice, to be an actual security* or other financial instrument issued under the authority of the United States, a foreign government, a State or other political subdivision of the United States, *or an organization*, shall be guilty of a class B felony.

18 U.S.C. § 514(a)(2) (emphasis added).  Any term used in § 514 that is defined in 18 § 513(c) has the same meaning given to that term in § 513(c).  Id. § 514(b).  Relevant to Defendant's case, section 513(c)(3)(A) defines "security" to include a check, and section 513(c)(4) defines "organization" to include any corporation or company which operates in or

_____

lending institution.  (Doc. 81 at 42.)

[6]      In fact, Defendant went to great lengths at trial to elicit testimony that each of the five checks were, in fact, counterfeit (as opposed to genuine).  (See, e.g., Doc. 80 at 56, 117-18, 209, 246; Doc. 81 at 60.)

5

affects interstate commerce (e.g., a federally insured financing institution).[7]  Neither § 514 nor § 513(c) define "false or fictitious instrument, document, or other item."

Under the plain language of § 514 and its incorporated definitions from § 513(c), it appears that one way a person can violate the statute is by passing a document that appears to be an actual bank check but which is in fact a fake bank check, which exactly describes the Defendant's proven conduct in this case.  However, Defendant contends that the only conduct prohibited by § 514 is the creation of wholly non-existent documents, such as a $100,000,000 federal reserve note or a fictitious bond.  As a result, he argues that "the conduct of passing [a] counterfeit check[ ] which purports to be genuine but is not because it has been falsely made or manufactured in its entirety, should be charged under section 513 [which prohibits passing counterfeited securities] and not 514."  (Doc. 91 at 6.)  In support of his argument, Defendant primarily relies upon two cases, United States v. Howick, 263 F.3d 1056 (9th Cir. 2001), and United States v. Morganfield, 501 F.3d 453 (5th Cir. 2007).[8]

In Howick, the defendant was convicted under § 514 of possessing with fraudulent intent $100,000,000 and $500,000,000 federal reserve notes, which do not exist.  Howick, 263 F.3d at 1066.  Due to a paucity of caselaw interpreting § 514, the Ninth Circuit reviewed the legislative history of the statute to determine its scope.  Id. at 1066-67.  The Court noted

---

[7]     See, e.g., United States v. Lee, 439 F.3d 381, 386 (7th Cir. 2006)("All federally-insured banks operate in and affect interstate commerce.")

[8]     As no Eleventh Circuit case has directly addressed the scope of § 514, Defendant's argument presents an issue of first impression in this Circuit.

that in enacting § 514, Congress sought to "close a loophole" in federal counterfeiting law; namely, to explicitly prohibit the fraudulent creation or uttering of non-existent instruments, conduct which was previously outside the scope of the bank fraud and counterfeiting statutes. Id. at 1066-67 (quoting 141 Cong. Rec. S9533-34). The Court concluded that Congress had intentionally drawn a distinction between a "counterfeit" obligation, i.e., a bogus document contrived to appear similar to an existing financial instrument, and a "fictitious" obligation, i.e., a bogus document contrived to appear to be a financial instrument, where there is in fact no such genuine instrument. Id. at 1067. It therefore interpreted the phrase "false or fictitious instrument" to refer to non-existent instruments, as opposed to "doctored up versions of obligations that truly exist." Id.[9]

In Morganfield, the defendants were convicted of violating § 514 for their participation in a scheme involving the passing of worthless bank-issued checks:

> The scheme essentially operated in four steps. First, registering an entity with a local authority, they obtained a d/b/a certificate for the business. There was no business, however, just a nonexistent shell company. Second, the conspirators used the d/b/a certificates to open commercial checking accounts in the names of the shell companies, making a small initial deposit. *The banks would assign account numbers and issue checks in the names of the shell companies.* The conspirators used the personal identifications of other persons, which were bought or stolen, when opening the checking accounts. Third, the

---

[9]     Notably, due to the nature of the instruments at issue in Howick, the bulk of the Court's analysis concerned a different question: "whether section 514 contains a threshold requirement with respect to the credibility of the contrived documents." Id. at 1067. On this question, the Court concluded that "[a]n unlawful fictitious obligation . . . is one that appears to be 'actual' in the sense that it bears a family resemblance to genuine financial instruments." Id. at 1068. Because the documents in Howick were indisputably "unlawful fictitious obligations" under § 514, the Court did not have occasion to conclude— as Defendant suggests—that a counterfeited obligation could not, under any circumstances, be a "false or fictitious instrument" within the meaning of the statute.

> conspirators would make the shell company checks, styled as payroll checks, payable to fake payees using the names of persons whose identifications they also had either bought or stolen. The checks were signed with the name of a nonexistent person, often with a signature stamp. The amounts the checks were drafted for would exceed the value of the deposit used to open the checking account. Finally, the conspirators would cash the checks at unsuspecting grocery and convenience stores.

Morganfield, 501 F.3d at 456-57 (emphasis added). In other words, the defendants in Morganfield opened checking accounts and were issued *genuine* bank checks (albeit in the name of a company that, unknown to the bank, was merely a shell), signed the checks in the name of a non-existent person (apparently implying that the person was an agent of the shell company), made the checks payable to persons whose identifications they had obtained illegally, and then cashed the checks, which would require their forging the signatures of the persons whose identifications they used. The defendants argued "that there was insufficient evidence to find them guilty [of violating section 514] because a check, even if it is worthless, is not, as a matter of law, a 'false or fictitious instrument.'" Id. at 457. Relying principally upon Howick, the Fifth Circuit agreed. Id. at 459-60. In so holding, however, the Court distinguished a number of cases supporting a broader construction of the statute—i.e., one that would encompass counterfeited obligations within the definition of "false or fictitious instrument"—on the grounds that those cases "each involve[d] situations *where a fake instrument was used*, the defendant had pleaded guilty and was not challenging the scope of § 514(a), or some combination thereof." Id. at 460 (emphasis added).[10] Notably, in

---

[10] There are myriad Eleventh Circuit cases fitting this description, though none were cited in Morganfield. See, e.g., United States v. Grant, 431 F.3d 760, 761 (11th Cir. 2005) (affirming intended loss calculation in defendant's sentence "for producing and possessing counterfeit corporate checks, in violation of 18 U.S.C. §[ ] 514"); United States

8

discussing two such cases, <u>United States v. Riley</u>, 335 F.3d 919 (9th Cir. 2003) and <u>United States v. Mims</u>, 13 Fed. App'x 880 (10th Cir. 2001), the Fifth Circuit implied that prosecution under § 514 would be proper where a defendant was charged with the production and uttering of counterfeit checks (as opposed to worthless but otherwise genuine checks). <u>See</u> <u>id.</u> at 460 n. 15 (noting that the defendant in <u>Riley</u>, in addition to stealing genuine checks and cashing them, "also used those stolen checks as templates for fake checks" and that the "defendant in <u>Mims</u> had made at least some of the checks himself" using check counterfeiting equipment that included "a word processor, a check program, and blank check stock")(internal quotation omitted). Accordingly, the Fifth Circuit concluded its analysis with the following proviso:

> The actions of Morganfield, Thomas, and their co-conspirators are plainly illegal; however [in prosecuting the case under § 514 instead of § 513(c)] the government charged Morganfield and Thomas under the wrong section. The checks in this case *were, on their face, genuine*. The checks *were actual negotiable instruments that were issued by legitimate banks where actual checking accounts existed.* Morganfield's and Thomas's subsequent actions may well have created "forged" or "counterfeit" obligations, but their actions did not turn otherwise "real" checks into a "nonexistent" type of security*. This is not to say that a scheme that involves wholly fake "checks" necessarily falls outside § 514(a); we conclude only that, where the underlying instruments are facially*

_____

v. Wilson, 340 Fed. App'x 562 (11th Cir. 2009) (affirming defendant's sentence under § 514, pursuant to guilty plea, for manufacturing counterfeit checks purporting to be from various businesses); <u>United States v. Rogozinski</u>, 339 Fed. App'x 963 (11th Cir. 2009) (upholding, on clear error review of evidentiary and sentencing issues, defendant's conviction under § 514 for passing a fraudulent check); <u>United States v. Streeter</u>, 209 Fed. App'x 909 (11th Cir. 2006) (affirming sentence of defendant convicted under § 514 for participation in a scheme in which defendant and a co-conspirator printed fraudulent checks from a computer and recruited persons to cash them at banks); <u>United States v. Reddick</u>, 185 Fed. App'x 817 (11th Cir. 2006) (affirming defendant's sentence, pursuant to guilty plea, on four counts of violating and conspiring to violate § 514 by utilizing a software program to produce counterfeit checks which were ultimately negotiated by third parties).

*genuine checks, § 514(a) is not applicable.*

Id. at 460-61 (emphasis added).

Defendant's passing of wholly fake checks appearing to be actual financial instruments is thus factually distinguishable from the conduct at issue in Morganfield, and falls squarely within the Fifth Circuit's proviso.[11] Despite this, Defendant insists that the because a check, even if counterfeit, is not a "non-existent instrument," the government may prosecute such conduct only under 18 U.S.C. § 513. (Doc. 81 at 145) ("[T]he true statute that this case should have been prosecuted on, at least these five counts, should have been under Section 513, which clearly covers counterfeit or forged obligations").

Section 514 criminalizes conduct relating to "any false or fictitious instrument, document, or other item appearing, representing, purporting, or contriving through scheme or artifice to be an actual security or other financial instrument." 18 U.S.C. § 514. And by its cross-reference to § 513(c)'s definition of "security", section 514 expressly provides that passing a false and fictitious document appearing to be an "actual" check is prohibited conduct. The statute does not exclude counterfeited documents from its scope, nor does it explicitly define "false and fictitious" to mean solely non-existent instruments or documents.

_____

[11]    Cf. Grant, 431 F.3d at 761 (recounting defendant's conduct, to which he was charged, pled guilty, and had his sentence affirmed under § 514, as follows: "[T]his case was about obtaining legitimate checks and specifically a photocopy of a legitimate check and going to a home computer with check writing software and inserting legitimate routing numbers and a legitimate business name into your computer on your check writing software and reproducing checks that you could then . . . go out and attempt to negotiate. [The photocopied checks] are-I guess the best word is templates. You take the body of the check. You reproduce it and then you put in whatever amount you want to put in and attempt to negotiate it . . . .")(alterations in original).

It would thus strain reason for § 514 to criminalize the production of a "non-existent instrument" which "appears" to be a check but not the production of a counterfeit check, which is certainly within the definitional scope of "false and fictitious."[12]

Merely because section 513 prohibits the passing of counterfeit checks does not mean that another statute cannot criminalize the same conduct. "The Federal Criminal Code is replete with provisions that criminalize overlapping conduct . . . . The mere fact that two federal criminal statutes criminalize similar conduct says little about the scope of either." Pasquantino v. United States, 544 U.S. 349, 359 n.4 (2005). Section 514 "closed a loophole" in the federal criminal laws, but its application is not limited—either explicitly or implicitly—only to conduct that comes within that loophole. Although Defendant's conduct was not within the loophole, it nevertheless was within the scope of the statute. And while the government could certainly have prosecuted the defendant under § 513, it was not required to do so.

Accordingly, the Court finds that counterfeit checks are "false and fictitious documents" under § 514 and that the government has met its burden of proving Defendant guilty of Counts One through Five beyond a reasonable doubt.

---

[12] "According to the American Heritage Dictionary, false and fictitious both can mean not real or imaginary. [False: '[c]ontrary to fact or truth'; '[n]ot real or natural; artificial.' Fictitious: '[o]f, pertaining to, or characterized by fiction; imaginary.'] *Both words can also mean deceptive.* [False: '[d]eliberately untrue'; '[i]ntentionally deceptive.' Fictitious: '[a]dopted or assumed in order to deceive'; '[n]ot genuinely believed or felt; sham.']" Morganfield, 501 F.3d at 459 (emphasis added; footnotes converted to text).

**B.     Count Six - Unauthorized Use of Access Device**

Count Six of the superseding indictment charges Defendant with the unauthorized use of an access device in violation of 18 U.S.C. § 1029(a)(5).  The Eleventh Circuit pattern jury instructions do not include an instruction for violation of § 1029(a)(5).  However, the parties agree that, based upon the language in Offense Instructions No. 41.1 and 41.2 (which govern violations of related subsections § 1029(a)(1) and (a)(2)), the following elements must be proved by the government beyond a reasonable doubt to convict a defendant of violating § 1029(a)(5):

> (1) the defendant effected or caused to be effected transactions with one or more access devices issued to another person to obtain or attempt to obtain things of value totaling $1,000.00 or more during a 12 month period;
>
> (2) the defendant knowingly acted with the intent to defraud; and
>
> (3) the defendant's conduct affected interstate or foreign commerce.

At trial, the government introduced evidence establishing that Defendant utilized the Gelmans' bank account number and CNL Bank's routing number to make electronic payments via the internet for various goods and services, including, inter alia, payments on a Wal-Mart credit card, payments to a cell phone company, and payments for a rented storage unit.  (See Doc. 80 at 81-82, 119, 123-25, 217, 231-32; Doc. 81 at 5, 8-9, 17-18, 28, 30, 32-33; Exs. 1, 2, 18-20, 22, 28-34.)  These transactions resulted in Defendant obtaining things of value in excess of $11,000 over a 12-month period.  (Ex. 1.)  Further, the evidence established that none of the transactions charged in Count Six were originated by paper instrument, i.e., by a physical check.  (Doc. 80 at 217, 231-32.)

To support his Rule 29 motion as to Count Six, the defendant does not argue that he

did not effect or cause to be effected transactions from which he obtained money or property

worth more than $1,000 in a 12-month period, that he did not act with the intent to defraud,

or that his conduct did not affect interstate commerce. Rather, "[t]he defendant's sole

argument supporting his Rule 2[9] motion is that the alleged fraudulent conduct did not

violate section 1029(a)(5) as a matter of law because the checking account number the

defendant allegedly used without authorization is not an 'access device' as that term is

defined by statute." (Doc. 91 at 4.)

> 18 U.S.C. § 1029(a)(5) provides:
>
> a) Whoever–
> . . .
> (5) knowingly and with intent to defraud effects transactions, with 1 or more
> access devices issued to another person or persons, to receive payment or any
> other thing of value during any 1-year period the aggregate value of which is
> equal to or greater than $1,000;
> . . .
> shall, if the offense affects interstate or foreign commerce, be punished as
> provided in subsection (c) of this section.

18 U.S.C. § 1029(a). Section 1029(e) defines "access device" as "*any* card, plate, code,

*account number*, electronic serial number, mobile identification number, personal

identification number, or other telecommunications service, equipment, or instrument

identifier, or other means of account access *that can be used, alone or in conjunction with*

*another access device*, to obtain money, goods, services, or any other thing of value, or that

can be used to initiate a transfer of funds *(other than a transfer originated solely by paper*

*instrument)*." Id. § 1029(e)(emphasis added).

Defendant's argument with respect to Count Six goes like this: A checking account

number is printed on the bottom of paper checks issued for the account. Defendant used

13

such a checking account number to access the account to make electronic payments for various goods and services. Because Defendant used a checking account number, his conduct was equivalent to "pass[ing] checks via the internet." (Doc. 91 at 10.) Section 1029, in its definition of "access device", explicitly excludes "a transfer originated solely by paper instrument." 18 U.S.C. § 1029(e)(1). Thus, Defendant concludes that because the transfers "originated" from account numbers printed on a paper check, those numbers cannot be access devices within the meaning of the statute. (See Doc. 91 at 11) ("[T]he term account number [as used in § 1029] references account number(s) assigned to credit cards and debit cards, and specifically excludes transfers of funds originated solely by paper instrument").

The evidence at trial showed that each of the transfers charged in Count Six were originated *electronically*, with the Defendant using the Gelman's account number to initiate internet transactions. As such, the transfers were not accomplished "solely by paper instrument." Defendant's conduct therefore falls outside § 1029's narrow exception.

Further, there is no support for Defendant's construction of "account number" as excluding checking account numbers. Rather, "[s]ection 1029(e)(1) broadly defines 'access device' as '*any . . . account number . . .* that can be used . . . to obtain money . . . or to initiate a transfer of funds . . . .'" United States v. Dabbs, 134 F.3d 1071, 1080 (11th Cir. 1998)(emphasis in original). In Dabbs, the Court addressed whether the defendant's use of a bank's merchant account number was the use of an "access device" under 1029(e)(1). In finding that it was, the Court reasoned: "A merchant account number is a means of account access. The appellants deposited credit card sales into the account and obtained almost immediate access to those funds. It is thus readily apparent to this court that such

14

account numbers fall within this inclusive definition of access devices." Id. at 1080.

Defendant used checking account and routing numbers, a means of account access, to initiate electronic transfers from the Gelmans' CNL Bank account. This conduct falls squarely within the broad scope of § 1029. See United States v. Caputo, 808 F.3d 963, 966 (2d Cir. 1987)("It is apparent from the statutory language itself that account numbers fall within the definition of access devices. *There is no requirement that the number be printed on any particular medium. Account numbers are clearly a means of account access*, within the terms of § 1029(e)(1), *which can be used alone or in conjunction with another access device* such as a counterfeit card, to obtain something of value.")

Accordingly, the Court finds that the Gelman's checking account number is an "access device" within the meaning of § 1029 and that the government has met its burden of proving Defendant guilty of Count Six beyond a reasonable doubt.

## C.     Count Seven - Failure to Appear

### 1.     Whether Defendant Violated § 3146(a)(1)

Count Seven of the superseding indictment charges Defendant with failure to appear at final revocation hearing, as required by the conditions of his release, in violation of 18 U.S.C. § 3146(a)(1). The Eleventh Circuit pattern jury instructions provide, in Offense Instruction No. 94, that the following elements must be proved by the government beyond a reasonable doubt to convict a defendant of violating 18 U.S.C. § 3146:

(1) the defendant was released on bail by order of a judge or magistrate of this court;

(2) after being released, the defendant knowingly failed to appear before a judge or magistrate of this court as required.

Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, Offense Instr. No. 94.

To support his Rule 29 motion as to Count Seven, the defendant does not argue that he was not released on bail, that he was not ordered to appear at all proceedings as required, or that he did not fail to appear for the final revocation hearing as required. Rather, "defendant's primary argument is that his conduct did not violate section 3146(a)(1) as a matter of law because a failure to appear to a supervised release hearing is akin to a contempt of court, and a violation of supervised release is not an 'offense' as that term is defined under section 3146." (Doc. 91 at 5.) In addition, Defendant contends that the government failed to prove that he "knowingly" failed to appear for the revocation proceeding.

Contrary to Defendant's initial argument, section 3146(a)(1) contains no requirement that the failure to appear be related to an "offense" as defined in the statute. Rather, section 3146(a)(1) provides that a person commits the offense of failure to appear if, "having been released under this chapter [he] knowingly . . . fails to appear before a court as required by the conditions of release[.]" 18 U.S.C. § 3146(a)(1). Section 3146(b) then sets forth the various maximum penalties for violations of § 3146(a) as dependent upon the severity of the underlying offense in connection with which the defendant was released. Id. § 3146(b). Because the scope of the failure to appear violation itself is defined solely by § 3146(a)(1), Defendant's reliance on § 3146(b)'s penalty provisions as providing an implicit limitation upon that scope is misplaced. Defendant's related argument, that the government should have proceeded by charging Defendant with contempt sanctions for violation of a Court order

16

pursuant to 18 U.S.C. § 401(3) rather than seeking a conviction under § 3146, is similarly without merit. See United States v. Simmons, 913 F.2d 1215, 1217 (10th Cir. 1990)("Where a defendant, as here, has violated both a court order and section 3146 [by failing to appear at a hearing related to violations of his supervised release order], the government did not err in choosing to pursue the statutory remedy").

Regarding Defendant's second argument, that he did not "knowingly" fail to appear, the government provided extensive evidence regarding Defendant's constructive knowledge of the revocation hearing. Following an initial appearance on charges that he had violated the terms of his supervised release, Defendant was released from custody on April 19, 2010.[13] (Ex. 69.) On April 26, 2010, the Court issued a notice scheduling a final revocation hearing for May 27, 2010. (See Exs. 71, 72.) The notice was mailed to both Defendant and his counsel, William Charles Fletcher. (Doc. 81 at 86-88; Ex. 79 at 4; Ex. 80 at 4-5.)

Defendant's probation officer, Ron West, testified that he spoke to the defendant on May 6, 2010, at which time Mr. West directed Defendant to meet him at the probation office on May 10, 2010. (Doc. 81 at 93.) When Defendant failed to show up for the meeting, Mr. West spoke to Defendant's girlfriend, Linda Spivey (see Doc. 80 at 81-82), and asked her to tell Defendant to call Mr. West. (Doc. 81 at 94.) On May 18, 2010, Mr. West went to the last residence address that had been provided by Defendant, but he was not there. (Doc. 80 at 94-95.) Mr. West left a business card on the door instructing the defendant to contact

_____

[13]     Defendant was charged with violations of the terms of supervised release imposed in Case Nos. 3:03-cr-33(S1)-J-32TEM and 3:04-cr-48-J-32TEM, each entitled United States v. Dennis Gray Williams.

17

him. (Doc. 80 at 95.)  Mr. West also attempted to call the defendant four or five times using a telephone number that had been given to him by the defendant and with which he had called and spoken to the defendant in the past. (Doc. 80 at 95-96.)  Despite all of these attempts to contact the defendant, Mr. West was never able to reach him and never heard from him.  Likewise, Mr. Fletcher was unable to contact Defendant prior to the hearing, despite numerous attempts and voicemails.  (Doc. 81 at 77-78.)  Mr. Fletcher appeared for the May 27, 2010 hearing, but Defendant did not.  (Id. at 74, 79.)  When the defendant was finally located and arrested in June, 2010, he was in Knoxville, Tennessee. (Doc. 81 at 132-33.)

Defendant argues that the government failed to meet its burden of proof because it "presented no testimony that the Defendant received *actual* notice of the hearing." (Doc. 91 at 16) (emphasis added).  However, "actual" notice is not required for the government to prove a violation of § 3146(a).  See United States v. Weaver, 37 F.3d 1411, 1413 (9th Cir. 1994) ("When a defendant engages in a course of conduct designed to avoid notice of his trial date, the government is not required to prove the defendant's actual knowledge of that date"); Simmons, 912 F.2d at 1217; United States v. Martinez, 890 F.2d 1088, 1093 (10th Cir. 1989);  United States v. Yates, 698 F.2d 828, 830-31 (6th Cir. 1983); United States v. Clemons, 676 F.2d 124, 126 (5th Cir. Unit B 1982); see also Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, Special Instr. No. 8 (Deliberate Ignorance as Proof of Knowledge).  The evidence at trial proved that the defendant, subsequent to an initial appearance for violating his supervised release, purposefully engaged in a course of conduct designed to prevent him from receiving notice of the final revocation hearing, including

18

absconding to Tennessee in further violation of his release conditions. Accordingly, Defendant "knowingly" failed to appear for the hearing.[14]

> 2.    *Defendant's Penalty Under § 3146(b)*

The maximum statutory penalty for the offense of failure to appear is set forth in 18 U.S.C. § 3146(b)(1)(A):

> b) Punishment.– (1) The punishment for an offense under this section is–
>
> (A) if the person was released in connection with a charge of, or while awaiting sentence, surrender for service of sentence, or appeal or certiorari after conviction for--
>
>> (i) an offense punishable by death, life imprisonment, or imprisonment for a term of 15 years or more, a fine under this title or imprisonment for not more than ten years, or both;
>>
>> (ii) an offense punishable by imprisonment for a term of five years or more, a fine under this title or imprisonment for not more than five years, or both;
>>
>> (iii) any other felony, a fine under this title or imprisonment for not more than two years, or both . . .

18 U.S.C. § 3146(b)(1)(A).  In the superseding indictment, the government alleged that Defendant's underlying offense carried a maximum term of imprisonment of five years or more, and thus that his punishment for failure to appear should be governed by §

---

[14]    See Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010, Special Instr. No. 8 (Deliberate Ignorance as Proof of Knowledge) ("If a Defendant's knowledge of a fact is an essential part of a crime, it's enough that the Defendant was aware of a high probability that the fact existed – unless the Defendant actually believed the fact didn't exist. 'Deliberate avoidance of positive knowledge'—which is the equivalent of knowledge—occurs, for example, if a defendant possesses a package and believes it contains a controlled substance but deliberately avoids learning that it contains the controlled substance so he or she can deny knowledge of the package's contents.")

3146(b)(1)(A)(ii). This allegation was based on the government's presumption that the "underlying offense" was Defendant's supervised release violations, which, pursuant to the evidence at trial, carried a combined term of more than five years.[15]

However, in preparing its Findings of Fact and Conclusions of Law, the government discovered case law which holds that "the maximum term of imprisonment allowed under section 3146(b)(1)(A) for failure to appear at a hearing for revocation of supervised release should be based on the maximum possible punishment for the conviction that led to the term of supervised release, not the maximum possible punishment for the supervised release violation." (Doc. 86 at 34-35); see United States v. Phillips, 640 F.3d 154, 157-58 (6th Cir. 2011) (where defendant failed to surrender for service of sentence arising out of revocation of supervised release, the underlying offense for purposes of determining the maximum allowable sentence under section 3146(b) is not the supervised release violation; "If the underlying offense is not the supervised release violation, then it must be the only

_____

[15]    For the violations of his supervised release, Defendant faces maximum terms of imprisonment of two years in Case No. 3:03-cr-33(S1)-J-32MMH and four years in Case No. 3:04-cr-48-J-32TEM. (See Ex. 74 (Transcript of Change of Plea Hearing in Case No. 3:03-cr-33(S1)-J-32TEM) at 13) (defendant informed that a violation of supervised release would subject him to an additional term of imprisonment of up to two years); (Ex. 76 (Transcript of Change of Plea Hearing in Case No. 3:04-cr-48-J-32TEM) at 11-12) (defendant informed that a violation of supervised release would subject him to an additional term of imprisonment of up to two years for each offense, resulting in a potential total additional term of imprisonment of up to four years). In United States v. Quinones, 136 F.3d 1293, 1295 (11th Cir. 1998), the Eleventh Circuit held that district courts are permitted to sentence defendants to consecutive terms of imprisonment following revocation of concurrent terms of supervised release. See also United States v. Sweeting, 437 F.3d 1105, 1107 (11th Cir. 2006) (same) (citing Quinones, 136 F.3d at 1295). Accordingly, the defendant's violations of supervised release are punishable by a term of imprisonment of up to six years--which is a term of imprisonment of five years or more, as alleged in the superseding indictment.

alternative: the original conviction"); <u>United States v. Smith</u>, 500 F.3d 27, 32 (1st Cir. 2007) (where defendant failed to appear for final supervised release revocation hearing, the underlying offense for purposes of determining the maximum allowable sentence under section 3146(b) is the original offense, not the supervised release violation; "Congress' intent was to link the potential severity of punishment for failure to appear at a supervised release revocation hearing to the seriousness of the offense that originally led to the supervised release").[16]  In Defendant's case, the maximum term of imprisonment for the convictions underlying the supervised release proceedings was 35 years.  (<u>See</u> Ex. 74 (Transcript of Change of Plea Hearing in Case No. 3:03-cr-33(S1)-J-32TEM) at 12) (defendant informed that he faced a maximum term of imprisonment of ten years); (Ex. 76 (Transcript of Change of Plea Hearing in Case No. 3:04-cr-48-J-32TEM) at 12) (defendant informed that he faced a total maximum term of imprisonment of 25 years).  Thus, the government now contends that it should have alleged that the maximum punishment for the offenses underlying the failure to appear was fifteen years or more, and therefore urges the Court to find as a matter of law that Defendant is subject to a maximum sentence of ten years under section 3146(b)(1)(A)(i).  (<u>See</u> Doc. 92 at 2-4.)

The case was tried under Count Seven as alleged in the superseding indictment and the Court declines the government's invitation to constructively amend the superseding indictment at this late date.  Thus, the Court does not reach the issue of which offense—Defendant's violations of supervised release or the convictions underlying the

---

[16]      <u>Smith</u> and <u>Phillips</u> appear to be the only appellate opinions to address this issue.

supervised release proceedings---comprises the "underlying offense" for purposes of determining Defendant's punishment under § 3146(b)(1)(A). Under either interpretation, the evidence presented at trial established that, at minimum, Defendant's "underlying offense" carried a term of imprisonment of five years or more. Accordingly, Defendant's punishment for failure to appear will be limited to the five year maximum under § 3146(b)(1)(A)(ii), as originally alleged by the government.[17] It is hereby

**ORDERED:**

1.      Defendant's Rule 29 Motion for Judgment of Acquittal is **DENIED**.

2.      The Government has proven defendant Dennis Gray Williams guilty beyond a reasonable doubt on all counts. Defendant is adjudicated **GUILTY** of the offenses charged in Counts One through Seven of the Superseding Indictment (Doc. 19).

3.      Defendant's sentencing date will be set by separate order of the Court.

**DONE AND ORDERED** in Jacksonville, Florida, this 21st day of September, 2011.

TIMOTHY J. CORRIGAN
United States District Judge

jmm.
Copies to:
Arnold B. Corsmeier, AUSA
Wade M. Rolle, Esquire
U.S. Probation
U.S. Pretrial Services
U.S. Marshals Service
Defendant

---

[17]      Defendant's sentence under this Count must run consecutively to the sentences for Counts One through Six. See 18 U.S.C. § 3146(b)(2)("A term of imprisonment imposed under this section shall be consecutive to the sentence of imprisonment for any other offense").